310-0676. In re the Marriage of Lynn Weir, Appellee Lauren Drotkin v. Randy Weir, Appellant Gregory Jumbuck. Please proceed, Counselor. Thank you. May it please the Court, Ms. Drotkin. My name is Gregory Jumbuck of Breach Jumbuck & Associates, and I represent the opponent, Randy Weir. The case before the Court this afternoon is a case of a post-decree request for removal by the residential parent, excuse me, mother to the State of Alabama from the State of Illinois. The basis of the request for the removal by the mother was the fact that approximately 15 days after the party's judgment for dissolution of marriage was granted, she married a man who was at that point in time working in Lyle, Illinois. She was residing in Mokena at this point in time, and my client, Randy Weir, was residing in downtown Chicago in the Bridgeport area on the south side. Approximately four months after their marriage, Mr. Walsh, Ms. Weir's new husband, was terminated from his employment. Upon the termination of his employment, Ms. Weir filed a petition for removal requesting that she be allowed to remove the party's child, who was seven years old, at the time of the filing of the petition for removal, was in first grade, down to the State of Alabama. Now, there was joint custody under the dissolution decree? Yes, there was. And was there provision for notice by the mother to the father? There was a provision for notice. However, the record does not reflect that prior to the filing of the petition for removal that there is either a notice or a request for mediation by the mother to the father. However, upon the filing and upon the initial presentment of the petition for the removal, the parties were referred over to mediation. That mediation occurred in December of 2009 and obviously was unsuccessful prior to the case proceeding to trial. So there wasn't compliance with that agreement then? The record? The record does not reflect that there was compliance or non-compliance, to be honest, Justice Aldrich. Is that even important or not? To the extent that as a family law practitioner in the trial court, I think it's unfortunately more the reality of the situation that often you go see your attorney, you file your petition for removal knowing that you're going to wind up going to mediation anyway. So I think while it's potentially important from viewing the retaliated circumstances, given that Judge Brumman, when he rendered his decision, didn't find that there was any ill will or ill motives under the Eckert factors for Ms. Walsh's request for removal to Alabama, I would say that in the court's determination, I can't say that that was a determinant factor. The Eckert factors are obviously the factors which the trial court relied upon and attempted at least to apply to this case. There's three major factors that the trial court took into consideration. There's only three major factors that we briefed and that opposing counsel briefed within their brief. The first and the most important in this case is the likelihood of the enhancement of the general quality of life of the custodial parent or residential parent in this case and the child. I would submit to this court that, frankly, none of the facts to support enhancement in the general quality of life were highly lacking. And that's, of course, based upon a careful review of a lot of the case law. Judge Brumman, when he rendered his decision, pursuant to the testimony, stated, well, mom's going to get to be a stay-at-home mom. Therefore, that's an enhancement for the child. Almost de facto. And I would posit that that's not the standard on Ms. Walsh's part under 609 petition for removal where she maintains the burden of proof. There's quite a bit of testimony and exhibits admitted in the records that are related to the schools. Frankly, everything was published off of the Internet. My client and my trial counsel at that point in time submitted the Illinois state record report cards, whereas Ms. Walsh went onto a website and got basically grades from the school down in Alabama. She knew nothing as to how the testing was done to grade the school in Alabama, nor upon what basis they ranked the school. I believe it was ranked a 9 out of 10, but there's no foundational accuracy or requirements that she was able to testify to as to what it was. Did the judge consider that the schools were better? There's actually no pronouncement within the judge's decision that he addressed the school issue. I think it was a lot of testimony, a lot of exhibits between the two parties about it. However, Judge Broman and his decision never addressed the issue of the schools whatsoever. When the petition was filed, her husband was unemployed. When the hearing was held, he was working in Alabama. Correct. Was there any reason he couldn't send his new salary back to Illinois to purchase a house there? That's actually, I'm sorry. Go ahead. That's exactly what we actually argued, I believe, in our reply brief, that the argument that she was going to have a better financial condition because of the amount of money that he was earning, I believe it was about $3,500, is a rough ballpark figure that he was over his expenses in Alabama. And our argument is, frankly, that she's still entitled to that overage of money. One of the other issues that we address in our brief is that the only income expense affidavit submitted into evidence was an income expense affidavit from what the testimony seems to demonstrate was actually completed by Mr. Walsh for their anticipated expenses or what his actual expenses were within the state of Alabama. There's no expenses demonstrated, no shortfall of expenses demonstrated by Ms. Walsh while she was residing with her mother here in Frankfurt. When she filed the petition, she actually was still living in the marital home, I believe. No, Justice Wright. The marital home had been sold, I believe, in April. And in May she—or I'm sorry. I believe it had been sold in March, and she shortly thereafter had moved in with her mother. Okay. I may have my facts wrong, but I thought the marital home was sold in April of 2010. No, it was 2009. That I do know. All right. Because she had been—or is it—they had parties. The marital residence was in Frankfurt, Illinois, which is neighboring to Mokena. And upon the sale of the marital residence, that's when she moved in to her mother's house. And the child support obligation began then. Before then, her ex-husband was contributing to the household expenses. I believe that he was—he moved out in 2008 when the case was filed. I believe that the common law record reflects that there was a temporary support order and that all the expenses of the marital residence were being paid. He had been completely paid as to his child support as well as the daycare, which was also an issue that was brought up both in the briefs as well as the trial court. As Judge Brumman found that there was not going to be a need for daycare anymore, that this would lead to substantially more time that the child would be able to spend with the mother. However, it's not actually the case when examining the situation, at least not nearly as much as Ms. Walsh would have the court believe, because actually she was only looking at an increase—I believe she admitted on cross-examination— of approximately one hour per day during the school year that she would be with the child as opposed to time that she would be spending in daycare. The summer months are obviously when daycare was more pronounced for Carly. However, given the trial court's order as to when Mr. Weir would have the majority of his visitation, being during the summer, it's actually not that big of a reduction. And assuming arguendo that Ms. Walsh, because she listed that she had vacation expenses on her income expense affidavit, even if we assume that she had a reasonable amount of, say, two weeks vacation, it would only lead to her having—or Carly not being in daycare approximately three weeks after an analysis of the amount of the summer weeks from the school schedules, etc., etc. Did the court consider that when the minor is in Illinois during the summer with her father, he has to put her in daycare? No, there's no reflection of that in the record whatsoever. It is brought up in honesty in the reply brief of the appellee. However, the assertion is actually that, well, just because he has to go to work, he can actually put the child in daycare. And in our reply brief, it's quite interesting. You say that we should be granted a removal so that we don't have to employ daycare. But by the way, during your periods of visitation, you should go ahead and put the child in daycare or have family members care for the child. And the family members is also a crucial part of this case. Judge Brumman did find that there was a very closely knit family of my client as well as very strong relationships. Ms. Walsh admitted during her testimony that the child had, I believe, an exemplary relationship with her maternal grandmother and that she would see her maternal grandfather, I think it was twice per month. On the flip side, with my client, he basically lives on a block that's nothing but weird, for lack of a better term. The cousins, aunts, uncles, his mother, his sister, everyone lives within, the exact quote from Judge Brumman was, everyone lives within a stone's throw of each other in Chicago. And there's nothing, I think Ms. Walsh even admitted the fact that she currently maintains a fantastic relationship with all of her cousins, with my client's aunt or my client's sister as well as my client's mother. I mean the relationship is so strong and the family is so close knit that every single Saturday when Carly's there, they all go to church together. Every Sunday when Carly's over, especially, there's a Sunday dinner at 1 o'clock where the brothers, the sisters, the cousins, everyone comes over to grandma's house to celebrate the fact that it's Sunday and they're family together. Carly was taken away from all of that. She was taken to Alabama where her mother knew no one and had only been five times. Carly herself had only been there one time for four days, Easter weekend of 2010. Ms. Walsh had never been to the schools. When she tried calling the schools down in Alabama, the only people she was able to talk to was office staff which presumably was secretaries. She'd never spoken to a teacher, not spoken to the principal, not spoken to the superintendent. They say that Carly met a girl during that one Easter weekend that lived in the apartment complex where Mr. Walsh was living. Four days, she meets one person and that's some kind of a basis or strong root that she's already established to be ripped away from everybody and everything that she had here in Illinois. Also notably was the testimony of my client that Carly specifically said that she didn't want to go to Alabama because she was going to be leaving everything that she has here. And the amount of things that she had here, especially taking into consideration the visitation reduction that my client had, under Judge Brum's order, he went from 71 to 80 days of visitation to 49, depending upon whether or not it's an even year or an odd year and the way the holidays worked out under the Joint Parent Agreement. It's a 31 to 38 percent reduction. Judge Brum's comment and his decision when addressing the Eckert factor, the reasonable and realistic visitation schedule, without saying more, I find that it can exist. You too go figure it out. That's not a reasonable and realistic visitation schedule and it's not an analysis, and especially given the fact when we're talking about the stability that Carly had maintained here within the state of Illinois. Do you think the distance that the child was going to be moved away to would factor into the possibility of reasonable visitation? He had found a job in Green Bay, Wisconsin. In theory, they could drive back and forth every other weekend and maintain the same visitation schedule. Correct. And this move, however, required either a multiple 16-hour drive, something like that? I think the drive was about 15 hours, and while the assertion was that it was only an hour and a half flight, depending upon if you were flying into Nashville or, I believe, Wisconsin. So did the court consider the reasonability of visitation in light of the geographic distance between the parties? Not in its decision. It did not address the topic at all. How was the child to be transported from visitation? The only comment as to the transportation was that the cost would be borne by Ms. Walsh. I think both parties predominantly contemplated it was going to be airfare. There were other exhibits admitted by both parties as to what the cost of the airfare would be. Did the court consider putting a child 7 years old or 8 years old on a plane alone, or did he contemplate the parents would go with the child? There is no such comment. I can tell the court that, as it related to my client's exhibits, it was only anticipating his travel. I believe it was approximately $2,700 that would cost him for one 10-day trip to go down to Alabama. But the court never addressed whether or not we're putting a child on a plane by herself, whether Ms. Walsh will be traveling, or if both parties would be required to do some travel. The only real addressing of any travel was, A, that Ms. Walsh would have to pay for it, and, B, that if my client chose to do any visitation in the state of Alabama, he would be solely responsible for the costs. Counsel has two minutes. Thank you. So when we examine the reasonable and realistic visitation schedule, obviously we don't believe that that was taken care of, and our alternative prayer for relief is that the court be required under a more expanded visitation schedule. One of the other key factors that we wanted to address is the fact that Mr. Walsh, in a period of five years, had four jobs in four states. And he testified that that's usual. So we're taking Carly not only out of everything that she has here, but we're thrusting her into a situation where her new stepfather says, yes, it's usual that four times in five years that I'll be living in four different states. And it can't possibly be within a child's best interest to be moved back and forth that much. So we request that this court reverse the trial court's decision granting the removal in order that Carly be returned back to the state of Illinois. Thank you, Justices. Thank you. Counsel, do you need to argue? Thank you. May it please the Court, Counsel. Good afternoon. My name is Lauren Dropton from the law firm of Braun Networks. I represent the petitioner appellee Lynn Weir, now known as Lynn Walsh. My client has requested that this court affirm the trial court's grant of her petition for removal. Whether removal should be granted is a fact-specific, case-by-case determination, starting with the analysis set forth in Eckert and clarified in Collinburn by the Supreme Court. The question before you today is whether the grant of removal was arbitrary, unreasonable, and without basis in fact. The answer to that question is no. The trial court's determination was not against the manifest weight of the evidence, and there is ample evidence in the record, whether recited by the trial court in its findings or no, to support the trial court's grant of removal. Can I just stop you there? Whether it was cited by the trial court or not? Correct. Are you suggesting we can review this de novo, or are we limited to the findings that the court made? Based on my understanding of the manifest weight of the evidence standard, the question is, is there enough in the record to support the trial court's findings? And what did the trial court find was in the child's best interest? What factor or factors led him to the conclusion it was in the best interest for this child to move? The trial court found that the life of the mother and the child would be enhanced if petition was allowed. Because? Because he specifically stated that the mother would be able to be a stay-at-home mom. We all agree that is an enhancement. Was there anything else the trial court found that would enhance the child's quality of life or the mother's quality of life? With regard to the mother's quality of life, no. With regard to the child's life, yes. Because mom would be able to be more involved in the child's life by the child not being in daycare. There was other evidence in the record, for example. I'm trying to pinpoint you to tell me what the findings were. What did he find caused the enhancement? Because I think that's what we have to focus on. What the trial court recited was that by being able to be a stay-at-home mom, she would have more time with Carly. Not only would Carly not have to go to daycare, but she would have the ability to get normal stay-at-home mom chores done while Carly was at school. And there would be economic enhancement by not having to spend the money on daycare. However, again, based on the standard, it's not a de novo standard, but the question being, was there enough evidence in the record that to support the trial court, I think it is important to go over other evidence that, of course, the court considered when making its decision, when determining whether or not the mother and the child's life would be enhanced. If the judge didn't tell us that he articulated those other considerations, how can we assume that he did?  And I'm not aware of anything that requires the trial court to recite everything that it considered in its findings. What's our standard of review? Manifest with the evidence. And again, that being was, is there sufficient facts in the record to support the trial court's findings? That's why I'm answering that it is not required. Basically, the trial court came up with a conclusion under the first-decker standard that it would enhance the quality of life of the custodial parent and of the child. Am I correct? Correct. And so what you're saying is that conclusion is supported by evidence in the record. Correct. Absolutely. Even though it may or may not, that evidence be cited or articulated by the judge, the judge made a conclusion, and now you're going to tell us what's in that record that would support that conclusion. Correct. Okay. And what is that evidence? In addition, I think it is especially important because it is argued by counsel that being a stay-at-home mom is not enough of an enhancement, that both parents agreed that it was better for Carly to be with a parent rather than in daycare. In addition, Ms. Walsh testified that by being a stay-at-home mom, she would have more of an opportunity to volunteer at the child's school and to participate in field trips and whatever else they needed parents to do to volunteer at school, which is common. Now, opposing counsel says if we do a mathematical analysis here that that isn't as real as it appears on first blush, that when you look at that difference in an hour a day, then you look at the summer with vacation time being spent with the custodial parent, vacation time with the non-custodial parent, and you look at the overall visitation schedule, there's not that many hours that are there for allegedly special mentoring by a stay-at-home mom. I would disagree with that. Okay. Why? I was aware when I was reading the transcript that trial counsel said, oh, so you get an extra hour. I don't think that's realistic at all. Moreover, when she doesn't need to do her chores during off-school hours, that's more time that she has with Carly. Mr. Weir's visitation, if I remember the schedule correctly, based on the petition for removal, is that he has three weeks during the summer. So if a school vacation is ten weeks, then that's seven weeks that she has with Carly as opposed to only six. Well, maybe I'm not thinking clearly, but could she be a stay-at-home mom here in Illinois? That wasn't established and wasn't questioned. I think what's important to ask is what was the situation at the time in Illinois and what was the situation if the petition for removal was granted. If we go into what ifs, what could change with her being in Illinois. Right now she's not a stay-at-home mother in Illinois. She wasn't. She's already moved to Alabama. But, no, she was not a stay-at-home mom in Illinois. She was still working. Her father was. . . we don't know what the financial situation was, but she was still working when she was here in Illinois before she moved. With regard to the issue of enhancement, another factor in the record, while I agree with counsel, that the information regarding the schools was simply downloaded from the Internet, one thing that Ms. Walsh testified to was that the Moquina Elementary School was experiencing cutbacks in several areas, including gym classes, art classes, and extracurricular activities, and that based on her research, Heritage School was not experiencing those cutbacks. And that is also a factor that the court could have considered in finding that the child's life would be enhanced by a move to Alabama. With respect to Mr. Weir's visitation rights, I think that it requires a closer look at the record as to what visitation he was allotted and what visitation he actually exercised. The court articulated in his findings that, yes, dad had a close relationship with the child and did exercise his visitation on alternating weekends, which amounts to about a day and a quarter, less than a day and a half. And yes, the parties cooperated and he was able to start his visitation either at 10 or 11, but he never exercised midweek visitation. He had six weeks of vacation time from employment, and the only reason why he didn't exercise visitation with Curly, as he recited in the record, during midweek was because it was too hard. That, I think, is fair for the judge to evaluate whether or not he is exercising his visitation. In addition, there was time during the summer, even if he didn't think that Curly was ready to go for overnight, he could have taken her for a day or for several afternoons, several different weeks during the summer. He chose not to do that. Did the joint hurricane agreement set up visitation during the week? Yes, it said that he would have... By agreement. By agreement, midweek, correct. But it was set in stone that he was going to get her every other week. Correct. But you have evidence in the record that the parties were extremely flexible and cooperative. So I don't think that a presumption that he didn't exercise because it was never given to him or because it was never agreed upon is a fair presumption. In addition, Ms. Walsh asked him with regard to his 2009 visitation, is there time that you want to take during the summer so I don't have to pay for daycare? And Dad declined. He took an extra Friday over the long weekend for Fourth of July. So based on the time that he actually did exercise, by my calculations, it's about 37 1⁄2 days compared to the 49 days of vacation time which coincides with the seven weeks that he has off from work should he choose to take it, that he is given more time. In addition, the court considered whether or not he was actively involved in Carly's extracurricular activities and school and found that he was not, and that based on what Mr. Weir testified to, there was minimal involvement. Whether a realistic and reasonable visitation schedule may be reached is one that will preserve and foster the child's relationship with the noncustodial parent. It is also reasonable to expect the noncustodial parent to put forth some effort in order to maintain that close relationship, a close relationship, of course, being in the best interest of the child. Dad has been given seven weeks of vacation should he choose to take off from work. If he wishes, he can take six weeks off from work out of the seven for his time with Carly in Illinois that we were talking about, cost of babysitters. Based on his income and expense affidavit, he has a savings not only from not having to pay for daycare, but also there's a surplus in his income that if he wants, if he needs to, if he wants to hire someone to be with Carly while he's at work and while he sleeps after work as he works overnight, he has the choice to do that. And based on how much time he shares with his family, especially if he chooses, I don't think it's an unreasonable, it's an unreasonable expectation, although it's up to him. In addition, based on the savings from not having to pay for daycare and the entire cost of the child coming to Illinois, he'll have a savings of $3,216 a year. He estimated that a trip to Alabama booked two days in advance would cost $2,570, gives him an opportunity to go to Alabama to see Carly in her day-to-day life, to go to a dance recital if he would like to, to go to a parent-teacher conference, which he didn't do while she was living in Illinois. What grade was she in? She was in kindergarten. I believe she's in first grade now. Moreover, in addition to the 49 days, it was contemplated by the court based on the evidence before it that mom would be returning to Illinois for long weekends and for alternating holidays. So again, it was incorporated into the order and it was articulated by the trial court that he expected that mom would be returning to Illinois with Carly and that dad would have additional visitation time during mom's own trips back. With respect to the issue of potential harm based on the change in the visitation schedule, there is minimal evidence on this issue. While Mr. Weir testified that he would be crushed and his family testified that they would be devastated, the only testimony with regard to harm to Carly was from Ms. Wolfe. She was asked the question, didn't she think it would be detrimental to the father-child relationship if removal was allowed? And she said no. She believed that there would be a necessary adjustment, but no, that it would not be detrimental. What counsel recited as evidence that Carly did not want to go actually was offered for state of mind. The way that counsel is presenting it is hearsay. And all she said was that she would miss everyone that she knows is here. This is not a case where the child has a broad group of friends that she's going to miss. And while I have no wish to minimize the relationship with the extended family, the extended relationship, the relationship with the extended family, well, Michelle Weir testified that she started seeing Carly on a regular basis on alternating weekends in November of 2009. November of 2009 to July of 2010 is a very short period of time. So either there was this strong relationship that was built before November of 2009 based on sporadic contacts as were testified to by the Weir family, including Mr. Weir, his sister, and his mother, or it's a demonstration that the child can adjust and have a close relationship when she spends time with people. And based on either perspective, I believe that the court was entitled to consider that she could maintain close contacts with her extended family if the petition for removal was allowed. Counsel has two minutes. Actually, unless the court has further questions, I am finished. Any other questions? Thank you very much. Very kind. You know, is the child in second grade or first grade? Now she would be in second grade. I believe she was in first grade. So now she would be, once you went that, or this school year, 2010-2011, she would have been going into second grade. Counsel, I'm a little confused. The petitioner has the burden to show it's in the best interest of the child to be relocated? Correct. Does your client have an obligation to show that there's potential harm? I don't believe so, which is one of the issues I was going to address during my rebuttal. I don't believe that we had to demonstrate potential harm. May I ask a question that follows? When did the child go to Alabama? It would have been, presumably, after we filed a motion to stay, which I'm not sure is contained within the common law record, which was denied. We know about that. Go ahead. So that would have been September? Of 10. Of 10, correct. And the child was 7 at that time? Yes. I believe her birthday is July 31, 2003. Returned 7. So the child in Alabama would be in what grade now? My recall was that she was going to start second grade, which it may have been first grade, but I apologize, Justice Holder. I'm just trying to go off my memory. Okay. In response, Justice Wright, to one of your questions of Ms. Dropkin, this is the trial court's finding on the fact or the likelihood of enhancing the general quality of life of both the custodial parent and the child. Judge Berman's statement was, it's abundantly clear to me that the general quality of the petitioner's life will be greatly enhanced due to the fact that she would no longer have to be employed. She would be able to stay at home, whatever chores she has to do. Wouldn't have any responsibility for work other than to, as my wife tells me, she's not employed outside of the home. It's also very clear to me that because she's no longer employed, there will be no need for before or after school daycare. She would have more time to spend with the children, not in school, which in my opinion would also enhance the general quality of life of the child. Very, with all due respect, kind of terse and quick analysis. And I submit within my reply brief, well, and without a question, both parties said that yes, generally speaking, it would be better for a child to be with a parent rather than with a daycare provider. It seems to me to kind of ignore the realities. And I think this is exactly what I say in my reply brief. It ignores the realities of 21st century life that people have to use daycare more often than perhaps they did 20, 30 years ago, maybe even 10 years ago. And it's not such a harm to be in daycare as I think perhaps maybe Judge Brumman seemed to get to a conclusion that there was some kind of harm or it just wouldn't be as good. And is it really? Depends on the daycare, doesn't it? I'm sorry? Depends on the daycare. I would greatly say it's outside the record, so I didn't want to say it, but I guess I absolutely agree. Depends on the parent, too, doesn't it? Absolutely. And again, both these parents, to their credit, outside of this removal issue, got along pretty darn well. They agreed as to what time the pick-up and drop-off would be. They modified that outside of what the judgment was or the joint parenting agreement incorporated into the judgment fairly regularly prior to the removal. They also agreed that she could change from Frankfort School to Mocena. Correct. That's the House decision. Correct. And there was never an issue with that. And as it relates to the manifest way of the evidence, I think there's some pretty important evidence that the court and appellate counsel agrees misstated. Judge Brumman referred to his decision that he was, quote, trumped by some of the things that my client did or more poignantly didn't do. That he didn't attend the child's dance rehearsals or, I'm sorry, recitals, which everyone agrees that, in fact, the uncontroverted testimony was he went. That he didn't go to the school until after the petition for removal was filed. However, Ms. Walsh testified, no, he was at orientation and the family fun night, which occurred prior to the removal petition being filed. Moreover, Ms. Walsh's testimony was, I gave Mr. Weir the schedule for the school for the 2009-2010 school year at mediation in December of 2009. So despite the fact that, and I believe it's your obligation to tender those documents under the joint parenting agreement. Despite the fact that she didn't do that and that my client wasn't aware as to when those were, he still found out, he still went. So as it relates to manifest way of the evidence, Judge Brumman, and it's a minute, I believe it's page 19 of the appellate's brief. Clearly, he misstated facts that were before the record. Counsel has one minute. Thank you. And lastly, I just wanted to address the issue of in re marriage of Davis, which is a case that we cite as well as in re marriage of Creedon, which is a third district case. The manner in which this case went through trial and decision, I would submit to this court, was nothing but the mere ceremonial nature that the Davis court, which reversed the grant of removal, was referring. If you get remarried and you're clearly going to have additional funds, then removal should be granted, is what the trial court in essence found that. And the Davis court said absolutely not. As it relates to the amount of the visitation, this court in Creedon said, just because you're going to give a larger block of time, doesn't necessarily mean that that's going to be best for the child and actually could be harmful to a child in a given circumstance. So based upon that, and based upon the record, we respectfully request the court again to reverse the trial court's grant of the removal in order to currently be returned back to the state of Illinois. There are no other questions from the court. Thank you very much. Thank you, counsel. The court will take this case under advisement and we'll take.